2003 WY 98

**Timothy John DESHAZER, Appellant (Defendant),**

**v.**

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. 02–150.**

Supreme Court of Wyoming.

Aug. 21, 2003.

W. Keith Goody, Jackson, Wyoming, Representing Appellant.

Hoke MacMillan, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Richard Rideout, Special Assistant Attorney General, Representing Appellee. Argument by Messrs. Pauling and Rideout.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

HILL, Chief Justice.

[¶ 1] Appellant, Timothy John deShazer (deShazer), appeals from the judgment and sentence, adjudicating him to be guilty of the crimes of attempted kidnapping,[1] aggravated

---

1. Wyo. Stat. Ann. §§ 6–2–201 and 6–1–301 (LexisNexis 2003) provide:

**§ 6–2–201. Kidnapping; penalties; effect of release of victim.**

(a) A person is guilty of kidnapping if he unlawfully removes another from his place of residence or business or from the vicinity where he was at the time of the removal, or if he unlawfully confines another person, with the intent to:

(i) Hold for ransom or reward, or as a shield or hostage;

(ii) Facilitate the commission of a felony; or

(iii) Inflict bodily injury on or to terrorize the victim or another.

(b) A removal or confinement is unlawful if it is accomplished:

(i) By force, threat or deception; or

(ii) Without the consent of a parent, guardian or other person responsible for the general supervision of an individual who is under the age of fourteen (14) or who is adjudicated incompetent.

(c) If the defendant voluntarily releases the victim substantially unharmed and in a safe place prior to trial, kidnapping is a felony punishable by imprisonment for not more than twenty (20) years.

(d) If the defendant does not voluntarily release the victim substantially unharmed and in a safe place prior to trial, kidnapping is a felony punishable by imprisonment for not less than twenty (20) years or for life except as provided in W.S. 6–2–101.

**§ 6–1–301. Attempt; renunciation of criminal intention.**

(a) A person is guilty of an attempt to commit a crime if:

(i) With the intent to commit the crime, he does any act which is a substantial step towards commission of the crime. A "substantial step" is conduct which is strongly corroborative of the firmness of the person's intention to complete the commission of the crime; or

(ii) He intentionally engages in conduct which would constitute the crime had the attendant circumstances been as the person believes them to be.

(b) A person is not liable under this section if, under circumstances manifesting a voluntary and complete renunciation of his criminal intention, he avoided the commission of the crime attempted by abandoning his criminal effort. Within the meaning of this subsection, renunciation of criminal purpose is not voluntary if it is motivated, in whole or in part, by circumstances, not present or apparent at the inception of the person's course of conduct, which increase the probability of detection or apprehension or which make more difficult the accomplishment of the criminal intention. Renunciation is not complete if it is motivated by a decision to postpone the criminal conduct until a more advantageous time or to transfer the criminal effort to another but similar objective or victim.

assault and battery,[2] and aggravated burglary.[3] He was sentenced to a term of 8 to 15 years on the kidnapping conviction, 5 to 8 years on the aggravated assault and battery, and 10 to 20 years on the aggravated burglary. The sentences were to be served consecutive to one another.

[¶ 2] In this appeal, deShazer contends that the district court erred in failing, sua sponte, to suspend the proceedings because the court had reasonable cause to believe that deShazer was unfit to proceed because of his readily evident mental condition. In addition, he contends that the district court abused its discretion in denying motions for a new trial and to permit him to plead not guilty by reason of mental illness or deficiency, as well as by denying a second round of those same motions without a hearing on them. Further, deShazer contends that his defense attorney did not provide effective assistance of counsel by failing to enter a plea of not guilty by reason of mental illness or deficiency, and by failing to demand that the proceedings be suspended during trial because there was reasonable cause to believe that deShazer was not fit to proceed. Finally, deShazer contends that the convictions should have merged for purposes of sentencing.

[¶ 3] Because we are convinced that the district court failed to properly exercise its responsibility to suspend the proceedings when it became evident that deShazer was not mentally fit to testify on his own behalf, and because deShazer did not have the benefit of effective assistance of counsel, we will reverse and remand for a new trial.

## ISSUES

[¶ 4] As his issues, deShazer submits these matters for our disposition:

I. Did the court err when it failed to suspend the proceedings on its own motion since it had reasonable cause to believe that [deShazer] was unfit to proceed? Accordingly, were [his] rights under the 5th, 6th and 14th Amendments to the United States Constitution and the applicable provisions of the Wyoming Constitution violated?

II. Did the court err when it denied [deShazer's] motion to set aside the jury verdict, motion to grant ... a new trial and motion to permit [him] to enter a plea of not guilty by reason of mental illness and deficiency? Accordingly, were [his] rights under the 5th, 6th, and 14th amendments to the United States Constitution and the

---

2. Wyo. Stat. Ann. § 6–2–502 (LexisNexis 2003) provides:

§ 6–2–502. Aggravated assault and battery; penalty.

(a) A person is guilty of aggravated assault and battery if he:

(i) Causes serious bodily injury to another intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life;

(ii) Attempts to cause, or intentionally or knowingly causes bodily injury to another with a deadly weapon;

(iii) Threatens to use a drawn deadly weapon on another unless reasonably necessary in defense of his person, property or abode or to prevent serious bodily injury to another; or

(iv) Intentionally, knowingly or recklessly causes bodily injury to a woman whom he knows is pregnant.

(b) Aggravated assault and battery is a felony punishable by imprisonment for not more than ten (10) years.

3. Wyo. Stat. Ann. § 6–3–301 (LexisNexis 2003) provides:

§ 6–3–301. Burglary; aggravated burglary; penalties.

(a) A person is guilty of burglary if, without authority, he enters or remains in a building, occupied structure or vehicle, or separately secured or occupied portion thereof, with intent to commit larceny or a felony therein.

(b) Except as provided in subsection (c) of this section, burglary is a felony punishable by imprisonment for not more than ten (10) years, a fine of not more than ten thousand dollars ($10,-000.00), or both.

(c) Aggravated burglary is a felony punishable by imprisonment for not less than five (5) years nor more than twenty-five (25) years, a fine of not more than fifty thousand dollars ($50,-000.00), or both, if, in the course of committing the crime of burglary, the person:

(i) Is or becomes armed with or uses a deadly weapon or a simulated deadly weapon;

(ii) Knowingly or recklessly inflicts bodily injury on anyone; or

(iii) Attempts to inflict bodily injury on anyone.

(d) As used in this section "in the course of committing the crime" includes the time during which an attempt to commit the crime or in which flight after the attempt or commission occurred. [Emphasis added.]

applicable provisions of the Wyoming Constitution violated?

III. Did the court err when it ruled on [deShazer's] motion to set aside the jury verdict without a hearing? Accordingly, were [his] rights under the 5th, [6th,] and 14th Amendments to the United States Constitution and the applicable provisions of the Wyoming Constitution violated?

IV. Was defense counsel ineffective by failing to enter a plea of not triable and not guilty by reason of mental illness and deficiency and by failing to request that proceedings be suspended during trial since there was reasonable cause to believe that [deShazer] was unfit to proceed? Accordingly, were [his] rights under the 5th, 6th, and 14th Amendments to the United States Constitution and the applicable provisions of the Wyoming Constitution violated?

V. Should the convictions have merged for purposes of sentencing?

The State's summary of the issues is in substantial harmony with that presented by deShazer.

### FACTS

[¶ 5] The victim of the crimes and deShazer were childhood friends who attended school together and lived in the same neighborhood in Omaha, Nebraska, until they finished high school. At that time, the victim moved to Buffalo with her family, and the two had no contact again until April 27, 1998, when she called him "out of the blue." For the next month they were in frequent contact by phone and e-mail, and then over Memorial Day weekend in 1998, they met in Chamberlain, South Dakota, to see one another. At that time deShazer was living in Milwaukee.

[¶ 6] The two also spent a week together in Illinois, Wisconsin, Minnesota, Canada, and North Dakota, from July 6–13, 1998, at which time they returned to Buffalo. During that trip, deShazer mentioned to the group with whom they were traveling that he was planning to move to Wyoming, which came as a surprise to the victim. He stayed in Buffalo with the victim until sometime during the first week of August, at which time he left. In the victim's perception, he was leaving and probably not coming back. The victim wanted deShazer to leave because she was going to Nevada to stay with her sister, who had been diagnosed with cancer. deShazer sent flowers to the victim and her sister and called persistently until the victim began declining to answer the phone if the caller ID indicated it was deShazer calling.

[¶ 7] The victim returned to Buffalo in late August of 1998. At that time she received a call from deShazer, and when she answered the phone, he said, "So it didn't work out did it?" She responded, "No, it didn't." The victim perceived that deShazer became angry and protested that he had spent a lot of time and money on their relationship. The victim said she could not do anything about the time but she would be glad to reimburse him for the money. He gave a figure of $600.00, and the victim said she would try to pay him over time and that she never wanted to hear from him again.

[¶ 8] Nonetheless, deShazer persisted in calling the victim on a weekly basis and she habitually would hang up on the calls and instructed her children to do the same. On one occasion, a male friend of the victim answered the phone, and the caller hung up. The caller ID indicated that the call was from "deShazer, T." Not long after that, he called her again and said, "So, you have a new dick in your life." The victim then changed her phone number and e-mail address, and the phone calls and other communication ceased for a time.

[¶ 9] After returning from a trip to Seattle on January 3, 1999, the victim found a note from deShazer in her mailbox. In that note he wrote: "Sorry I missed you. I hope to hear from you by January 10. Otherwise—perhaps you will see when I return. P.S. As you recall communication is one of the trusts we put in each other." The note had not come through the mail but appeared to have been placed in her mailbox by deShazer. The victim believed the note was a veiled threat and took it to the Buffalo police. She then sent two letters, one of which she composed, and one composed by her attorney, but neither was received by deShazer (they were sent certified mail and were re-

turned undelivered). Those letters demanded that deShazer desist from having any contact with the victim. Toward the end of 1999 the victim became increasingly anxious about deShazer's intentions. Based upon information which she received from her sister, who had in turn been in contact with deShazer's sister, the victim was aware that deShazer was unrelenting in his obsession about her. In addition, several suspicious calls were made to her home in November and December of 1999. As a result, the victim borrowed a handgun from her father for protection.

[¶ 10]   January 5, 2000, was a usual workday for the victim and, although she had planned to go out with her fiancé that night, those plans were cancelled and she stayed at home alone doing work. It was a Wednesday night, and the victim's children were with her former husband for visitation. The victim opined that deShazer was aware that she was usually alone on Wednesday nights, because he learned about that routine while he was there. As she was about to leave home to go out to a friend's ranch, the victim thought she heard someone trying to open the back door from the outside, and it frightened her. Next, she heard pounding on the front door and could tell it was about to give way. She attempted to make a phone call to a friend but spoke only a few words and had to drop the phone and retreat to what she thought might be safety. That friend called the victim's neighbor and asked the neighbor to go over and check on the victim. The victim ran into her bedroom to get the gun that she had borrowed from her father and at that point, she could tell that whoever had broken in the front door was in the house. She could hear deShazer screaming out her name and then she saw him coming down the hall with a gun pointed at her. She told deShazer that she too had a gun and that she would shoot. deShazer then put his gun down on the floor, removed the goggles he was wearing, and put them in a black duffel bag that he was carrying.[4] He said to the victim,

"Don't you know I've loved you since the 5th grade. My whole family thinks I'm a stalker ... and it's all your fault."

[¶ 11]   At this point, the victim's back door bell rang. As things eventuated, it was her neighbor, who her friend had called, coming to check on her. deShazer asked the victim several times if she had called the police, and she said that she had not. The victim, who had been cornered in her bedroom, put down her gun and began walking toward the back door to answer it, hoping deShazer would not shoot her. When she got to the door, it was her neighbor. The victim told deShazer that she was leaving and that he should leave also. She then left with her neighbor and they ran to the neighbor's house and called 911. The police arrived within 5–10 minutes. The victim was able to call deShazer's sister and get a description of his car and the license number, *etc.*, which was relayed to the police. deShazer was apprehended near Gillette a short time later.

## STANDARD OF REVIEW

■   [¶ 12]   We turn to the Tenth Circuit Court of Appeals for an outline of the standards that must be employed in the review of issues relating to competency of a defendant as it pertains to the trial process:

Although competence is a factual issue, that term, as this case clearly demonstrates, is not self-defining. Because competency to stand trial is an aspect of substantive due process, ... the legal standard by which competency is to be evaluated is constitutionally mandated. Accordingly, the components of that standard, required as they are by the Constitution, do not vary according to the views of a particular court. The Constitution can require but one gauge against which to determine whether, because of his mental condition, a defendant's due process rights are violated by requiring him to stand trial. The content of the stan-

---

**4.**  In order to make the narrative complete, we will point out that deShazer came to this confrontation supplied with an unusual amount and array of gear, including: the goggles; shin guards under his pants; jock strap with plastic cup; bolt cutters; charcoal lighter fluid; Berretta pistol; Muscle–Man stun gun; duct tape; pepper mace; gas can with gas in it; flex ties that could be used to bind a person's wrists; and much more.

dard of competency is therefore a question of law which we review de novo.

*Lafferty v. Cook,* 949 F.2d 1546, 1550–56 (10th Cir.1991) (internal citations omitted); *State v. Soares,* 81 Hawai'i 332, 916 P.2d 1233, 1251 (App.1996); *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam); and *see Hayes v. State,* 599 P.2d 558, 562–63 (Wyo.1979).

[¶ 13] Here, the district court did not conduct a competency hearing, so no standard was employed. However, the standard for such a hearing is that set out in the cases cited immediately above. Once the trial court has "evaluated a defendant's competency by the correct standard, the second inquiry on review is whether the trial court's determination of a defendant's competency is fairly supported by the record of the proceeding at which the determination [is] made.... In other words, the substantial evidence standard of review governs the second inquiry." *Soares,* 916 P.2d at 1251. Again, because no competency hearing was conducted, the record at trial cannot provide the factual information necessary to evaluate this second prong of the test. The information supplied to the district court post-trial (to determine if deShazer was competent to proceed with sentencing and whether or not there should be a new trial) addresses the substantive issue of whether or not deShazer was competent and/or insane before, during, and after trial.[5]

**Failure of District Court to Suspend Proceedings Sua Sponte**

[¶ 14] The status of deShazer's mental health was in question from the very outset of this case. In fairness, we note that neither defense counsel nor the prosecutor were of much assistance to the district court with respect to this looming problem. Of course, the very acts which constituted the crime suggested that a problem could exist, and all participants, including the district court, were aware of that. This factor cannot count for much, however, as many if not most crimes suggest mental health problems.

[¶ 15] Considerable evidence was seized at the time deShazer was arrested, including tape-recorded "rantings" and typewritten and handwritten letters and notes, most of which might have raised the spectre of mental illness or incompetency even in the mind of a lay observer. Those materials strongly suggested that deShazer's "state of mind" was that he intended to kidnap and kill the victim and then take his own life. Indeed, that was the State's theory of this case. Further, the State's theory of the case was that deShazer's actions required cool calculation and considerable detailed planning, belying a suggestion that he was incompetent. On the other hand, the defense strategy at trial was that deShazer was merely a lovesick fool who honestly believed that if he could force the victim to hear him out, all of his problems with respect to their broken relationship would be solved.

[¶ 16] At the arraignment on February 15, 2000, the district court inquired in a general way if deShazer was satisfied with his attorney, to which he answered, "Yes," and further if defense counsel "was aware of any procedural problems or detrimental delay in the case so far," to which defense counsel answered, "No." At a pretrial conference held on April 4, 2000, defense counsel indicated that deShazer was doing well. However, during that same court proceeding, the prosecutor called the district court's attention to the fact that deShazer's father had attempted to have his son involuntarily committed to a mental hospital shortly before the crimes were committed because he believed his son to be obsessed with the victim, severely depressed, and suicidal. At a bail modification hearing held on April 11, 2000,

5. That evidence is in conflict, but we summarize it here in order to more fully explain the circumstances of this case. The Wyoming State Hospital's evaluation of deShazer determined that he suffered from a mental illness that was treatable with psychotropic drugs and that he was not competent to stand trial. deShazer was also evaluated in the federal prison system after parallel federal charges were filed against him. That evaluation was made after deShazer had been taking psychotropic drugs and his mental illness was in remission. Contrary to the Wyoming State Hospital's findings, the federal evaluation determined that deShazer had no mental illness and was competent to stand trial at the time he was tried.

the district court made this comment directed to the prosecuting attorney:

COURT: Well, Mr. Erb, obviously, the accusations against the Defendant are quite serious. One thing that was disturbing to the Court, however, was you attaching to this motion a document that appears to be some sort of petition or pleading that might be filed in a case that alleges the mental incompetency of this Defendant.

Do you know why that might be important to the Court? It is because any party to a criminal action, including the Court, might request an examination of a Defendant to see whether or not he is competent to stand trial, to see whether or not he is competent at the time of the alleged instances. And I do not want a 9th inning pitch for a mental health evaluation when we already have this matter scheduled for trial. Is that going to happen?

MR. ERB: I do not anticipate bringing such a motion, Your Honor. Mr. Goddard has indicated that they do not intend to offer any evidence regarding insanity or mental illness as a defense.

I presented those documents, Your Honor, so that the Court would be well advised in order to make an appropriate ruling on bond. This is information that was provided to us from the family, the people who know him best.

[¶ 17] The hearing then moved away from that subject and on to further discussion of modifications to deShazer's bond. However, a bit later in the proceedings the defense attorney informed the district court that deShazer "was examined by two mental health professionals before the ultimate plea was made of not guilty to determine whether he was a danger to himself or others."[6] Clearly, an alarm bell went off for the district court, and he pressed the defense attorney for more detailed information. In response, the defense attorney revealed this:

MR. GODDARD: Part of our proceeding and part of what happened, we needed to make sure, in fact, what kind of plea we were going to make with regard to Mr. [d]eShazer; and we had to have at least some indication about his mental competency and his state of mind.

He was examined by two mental health professionals. That was then utilized to make our determination as to what pleas were going to be made. Both of which found him not to be a danger to himself or others.

[¶ 18] The mental health issue came before the district court at a hearing held on April 18, 2000, but the district court indicated that it did not want to consider that issue as part of a "substantive argument," but only wanted to consider the foundation and hearsay aspects of it. The trial got underway on May 8, 2000 and continued until May 11, 2000.

[¶ 19] The district court had made it clear that any matters relating to a sanity defense had to be raised before trial, but no such plea was offered. Near the end of the State's presentation of its case, the defense first broached the subject of whether or not deShazer was fit to proceed. Wyo. Stat. Ann. § 7–11–302 (LexisNexis 2003) provides:

(a) No person shall be tried, sentenced or punished for the commission of an offense while, as a result of mental illness or deficiency, he lacks the capacity, to:

(i) Comprehend his position;

(ii) Understand the nature and object of the proceedings against him;

(iii) Conduct his defense in a rational manner; and

(iv) Cooperate with his counsel to the end that any available defense may be interposed.

Wyo. Stat. Ann. § 7–11–303 (LexisNexis 2003) provides:

(a) **If it appears at any stage of a criminal proceeding, by motion or upon the court's own motion, that there is reasonable cause to believe that the accused has a mental illness or deficiency making him unfit to proceed, all further**

---

**6.** So far as we can perceive from the record, these evaluations were directed toward whether or not deShazer was dangerous to himself or to others and did not purport to be for the purpose of determining competency or sanity. *See* Wyo. Stat. Ann. §§ 25–10–101(a)(ii) and 25–10–109(b)(ii) (LexisNexis 2003).

**proceedings shall be suspended.** [Emphasis added.]

(b) The court shall order an examination of the accused by a designated examiner. The order may include, but is not limited to, an examination of the accused at the Wyoming state hospital on an inpatient or outpatient basis, at a local mental health center on an inpatient or outpatient basis, or at his place of detention. In selecting the examination site, the court may consider proximity to the court, availability of an examiner, and the necessity for security precautions. If the order provides for commitment of the accused to a designated facility, the commitment shall continue no longer than a thirty (30) day period for the study of the mental condition of the accused.

(c) Written reports of the pretrial examination shall be filed with the clerk of court. The report shall include:

(i) Detailed findings;

(ii) An opinion as to whether the accused has a mental illness or deficiency, and its probable duration;

(iii) An opinion as to whether the accused, as a result of mental illness or deficiency, lacks capacity to comprehend his position, to understand the nature and object of the proceedings against him, to conduct his defense in a rational manner, and to cooperate with his counsel to the end that any available defense may be interposed;

(iv) An opinion as to whether at the time of the alleged criminal conduct the accused, as a result of mental illness or deficiency, lacked substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law;

(v) A recommendation as to whether the accused should be held in a designated facility for treatment pending determination by the court of the issue of mental fitness to proceed; and

(vi) A recommendation as to whether the accused, if found by the court to be mentally fit to proceed, should be detained in a designated facility pending further proceedings.

(d) The clerk of court shall deliver copies of the report to the district attorney and to the accused or his counsel. The report is not a public record or open to the public. After receiving a copy of the report, both the accused and the state may, upon written request and for good cause shown, obtain an order granting them an examination of the accused by a designated examiner of their own choosing. For each examination ordered, a report conforming to the requirements of subsection (c) of this section shall be furnished to the court and the opposing party.

(e) If the initial report contains the recommendation that the accused should be held in a designated facility pending determination of the issue of mental fitness to proceed, the court may order that the accused be committed to or held in a designated facility pending determination of mental fitness to proceed.

(f) If neither the state, nor the accused or his counsel contests the opinion referred to in paragraph (c)(iii) of this section relative to fitness to proceed, the court may make a determination and finding of record on this issue on the basis of the report filed or the court may hold a hearing on its own motion. If the opinion relative to fitness to proceed is contested the court shall hold a hearing on the issue. The report or reports may be received in evidence at any hearing on the issue. The party contesting any opinion relative to fitness to proceed has the right to summon and cross-examine the persons who rendered the opinion and to offer evidence upon the issue.

(g) If the court determines that the accused is mentally fit to proceed, the court may order that the accused be held in confinement, be committed to a designated facility pending further proceedings, or be released on bail or other conditions. If the court determines that the accused lacks mental fitness to proceed, the proceedings against him shall be suspended and the court shall commit him to a designated facility for such period as the court may order but not to exceed the time reasonably necessary to determine whether there

is substantial probability that the accused will regain his fitness to proceed:

(i) If it is determined that there is no substantial probability that the accused will regain his fitness to proceed, the accused shall not be retained in a designated facility unless proper civil commitment proceedings have been instituted and held as provided in title 25 of the Wyoming statutes. The continued retention, hospitalization and discharge of the accused shall be the same as for other patients. However, if the accused is discharged, the criminal proceedings shall be resumed, unless the court determines that so much time has elapsed since the commitment of the accused that it would not be appropriate to resume the criminal proceeding;

(ii) If it is determined that there is substantial probability that the accused will regain his fitness to proceed, the commitment of the accused at a designated facility shall continue until the head of the facility reports to the court that in his opinion the accused is fit to proceed as provided in paragraph (iii) of subsection (c) of this section. If this opinion is not contested by the state, the accused or his counsel the criminal proceeding shall be resumed. If the opinion is contested, the court shall hold a hearing as provided in subsection (f) of this section. While the accused remains at a designated facility under this subsection, the head of the facility shall report at least once every three (3) months on the progress the accused is making towards regaining his fitness to proceed.

(h) A finding by the court that the accused is mentally fit to proceed shall not prejudice the accused in a defense to the crime charged on the ground that at the time of the act he was afflicted with a mental illness or deficiency excluding responsibility. Nor shall the finding be introduced in evidence on that issue or otherwise brought to the notice of the jury. No statement made by the accused in the course of any examination or treatment pursuant to this section and no information received by any person in the course of the examination or treatment shall be admitted in evidence in any criminal proceeding then or thereafter pending on any issue other than that of the mental condition of the accused.

(j) Notwithstanding any provision of this section, counsel for the accused may make any and all legal objections which are susceptible of a fair determination prior to trial without the personal participation of the accused.

[¶ 20] The above-cited statutes are in harmony with the *ABA Criminal Justice Mental Health Standards* (1989). Of special importance here is Standard 7–4.2:

(a) The court has a continuing obligation, separate and apart from that of counsel for each of the parties, to raise the issue of incompetence to stand trial at any time the court has a good faith doubt as to the defendant's competence, and may raise the issue at any stage of the proceedings on its own motion.

(b) The prosecutor should move for evaluation of defendant's competence to stand trial whenever the prosecutor has a good faith doubt as to the defendant's competence. The prosecutor should further advise defense counsel and the court of any information that has come to the prosecution's attention relative to defendant's incompetence to stand trial.

(c) Defense counsel should move for evaluation of the defendant's competence to stand trial whenever the defense counsel has a good faith doubt as to the defendant's competence. If the client objects to such a motion being made, counsel may move for evaluation over the client's objection. In any event, counsel should make known to the court and to the prosecutor those facts known to counsel which raise the good faith doubt of competence.

(d) A motion for evaluation should be in writing and contain a certificate of counsel indicating that the motion is based on a good faith doubt that the defendant is competent to stand trial and that it is not filed for purposes of delay. The motion should also set forth the specific facts that have formed the basis for the motion.

(e) In the absence of good faith doubt that the defendant is competent to stand trial it is improper for either party to move for evaluation. It is improper for either party to use the incompetence process for purposes unrelated to incompetence to stand trial such as to obtain information for mitigation of sentence, to obtain favorable plea negotiation, or to delay the proceedings against the defendant.

(f) In making any motion for evaluation, or, in the absence of a motion, in making known to the court information raising a good faith doubt of defendant's competence, the defense counsel should not divulge confidential communications or communications protected by the attorney-client privilege.

Also see, John M. Burkoff, *Criminal Defense Ethics 2d Law and Liability*, § 5:6 (2002).

[¶ 21] As the prosecution was about to rest on the last day of trial, the defense attorney asked for an in-chambers conference. As that proceeding got underway, the defense attorney told the district court that based upon his observations, deShazer had "continued to improve" during the pretrial process. Defense counsel iterated that he had had mental examinations done and the examinations established that deShazer knew right from wrong and "that a competency defense was not appropriate." As defense counsel began to prepare deShazer for trial, he observed that deShazer was "extremely depressed," and was unable to concentrate or do the things necessary to get ready for trial. Through contacts the deShazer family had with a psychiatrist in Casper, an arrangement was made during the weekend break in the trial for deShazer to be evaluated by psychiatrist Bruce Kahn, M.D. Both defense counsel and the district court noted that deShazer had appeared to do well on the first day of trial, both in the courtroom and in chambers. Defense counsel's concern was that deShazer was not "capable" of assisting counsel in his defense nor was he "capable" of testifying in his own defense if he chose to do so. Defense counsel's indication was that, in any event, he did not intend to have deShazer testify. Defense counsel indicated that deShazer's testimony would not be ma-

terial and that after consultation with counsel, as well as with his family, a decision was made to go ahead with the proceedings. Defense counsel also conceded that he "never had a case like this, and I don't have experience with mental health people—or mentally ill people that has provided me any kind of background to do this. I'm prepared to proceed, but I thought the court needed to be aware." The district court then asked that deShazer be brought into chambers because it needed to "make some advisements and inquiry." The following advisement/inquiry was made:

THE COURT: I am informed that the State is close to the end of their case. So you and Mr. Goddard will be given an opportunity to put on a case of your own if you want to. Mr. Goddard has explained to me that there's a couple of witnesses that he thinks that you all will probably want to call, and that's fine.

The critical thing, though, that I want to be sure of is that you understand your personal right to either testify to or remain silent. The Court has absolutely no preference over which choice you make; it just wants to be sure that you understand the choice and that whatever choice you make along those lines is done of your own free will.

So you understand that as a matter of law you're not required to testify, correct?

THE DEFENDANT: Correct. But—

THE COURT: Also, at this stage of the game you absolutely have the right to testify if you want to. The choice that you make may be very important to you. And I suggest that you not make any choice like that without consulting with your counsel. But I need to know kind of ahead of time what you think you personally want to do. Not what somebody else thinks you ought to do, but what you want to do.

THE DEFEDANT: I want to, but I'm wrestling with whether or not I'm prepared for it (indicating) mentally. And I've been talking with Greg about that.

THE COURT: So you haven't made up your mind yet what you want to do?

THE DEFENDANT: Correct. I was hoping to talk to Greg here over this lunch break.

[¶ 22] When defense counsel called Dr. Kahn as a witness, a conference was held out of the hearing of the jury. The purpose of that hearing, as articulated by the district court, was, "[i]n this case the Defendant has not entered a plea of not guilty by reason of mental illness or deficiency and has represented to the Court that he will not tender any evidence regarding that type of defense." At the outset it was agreed that Dr. Kahn would not offer an opinion that deShazer met the statutory definition for incompetency due to mental illness or deficiency. Dr. Kahn was asked, and he responded to, a question regarding deShazer's mental state at the time of the crime. He opined:

DR. KAHN: Yes, I do have an opinion, in that he was psychotically depressed at the time of the offense and I think that his illness contributed substantially and materially to the commission of acts of which he's accused. I think that the mental illness contributed substantially and materially to loss of impulse control.

And it would be my further opinion, if I were asked, Your Honor, and allowed the opportunity to answer, that it meets the threshold criteria of the volitional prong of the mental illness statute, 7–11–301, et se[q]. as the lack of substantial capacity to refrain from conduct which doesn't conform to the requirements of [the] law.

[¶ 23] When the district court asked about deShazer's competency to stand trial, Dr. Kahn responded:

DR. KAHN: With all due respect, Your Honor, I think that he lacks [the] mental capacity to assist in some respects with his defense; but I think it would be your decision, Your Honor, if he did not—if he was not competent by virtue of the means—or, rather, the way in which he did not have mental capacity.

Let me explain it. I'm not being very clear, and I'm aware of that.

Capacity is a function of his mental wherewithal. Competency is a judicial construct, and it's not for me to tell the Court how relevant or significant his ability to testify might be. I do not think he has the mental capacity to testify in his own behalf. But if the Court were to decide that that's a relatively insignificant issue, for example, because counsel says we don't want him to testify regardless of how healthy he is mentally, then he probably is competent.

And regardless of how incapacitated he is mentally in that respect, in all other respects I think he has mental capacity to understand the nature of the proceedings and to assist counsel. The narrow exception is I don't think he can testify on his own behalf in his current frame of mind.

[¶ 24] After considerable further discussion, the district court determined that Dr. Kahn would be allowed to testify, so long as his testimony was precisely limited to "the Defendant's state of mind, some of the processes that go on with people if they do get involved in what we commonly refer to as an obsession, perhaps, arguably, the Defendant, you know, would have the right to offer that sort of explanation to the jury, since the contra inferences will obviously be made." Following Dr. Kahn's testimony, a very brief conference was held wherein deShazer stated that he had decided not to testify.

[¶ 25] Thus, we are confronted with determining whether, in light of all the information available to the district court, it should have sua sponte suspended the proceedings, declared a mistrial, excused the jury, and ordered a mental examination of deShazer before a new trial could be held. Wyo. Stat. Ann. § 7–11–303 does not make it entirely clear what procedure should be followed in an instance such as this where the problem does not come fully to light until the middle of a jury trial. However, in this regard, the statute plainly contemplates that it might arise "at any stage of a criminal proceeding." As future events bear out, it took several months for a mental examination to be completed at the Wyoming State Hospital for purposes of sentencing and a motion for new trial, and many more months yet for a second examination to be completed at the request of the prosecution. As a practical matter, the jury could not be held in waiting for a

period of over one year. In such a circumstance, we conclude that the only practical solution was to declare a mistrial and re-initiate proceedings, if that was the appropriate thing to do in light of the mental examination(s). As a predicate to that, we must also conclude that the district court was obligated to suspend the proceedings given the information that slowly accumulated before it, from the date of the crime until the ultimate bridge had to be crossed in the midst of trial.

[¶ 26] Wyo. Stat. Ann. § 7–11–302 affords broad protection to the mentally ill. Of course, the standard articulated by that statute is also the law of the land. *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). Wyo. Stat. Ann. § 7–11–303 places great responsibility on both the prosecutor and the defense attorney, but ultimately that responsibility must fall upon the shoulders of the district court. The *ABA Criminal Justice Mental Health Standards,* Standard 7–4.1 summarizes the prevailing law in this regard:

(a) No defendant shall be tried while mentally incompetent to stand trial.

(b) The test for determining mental competence to stand trial should be whether the defendant has sufficient present ability to consult with defendant's lawyer with a reasonable degree of rational understanding and otherwise to assist in the defense, and whether the defendant has a rational as well as factual understanding of the proceedings.

(c) The terms *competence* and *incompetence* as used within Part IV of this chapter refer to mental competence or mental incompetence. A finding of mental incompetence to stand trial may arise from mental illness, physical illness, or disability; mental retardation or other developmental disability; or other etiology so long as it results in a defendant's inability to consult with defense counsel or to understand the proceedings.

[¶ 27] The commentary to that standard emphasizes that the case law only establishes "a basic norm, understandably and necessarily imprecise, that permits individual judges to evaluate each case in the light of an individual defendant's level of functioning in relation to the complexity of that case." *ABA Criminal Justice Mental Health Standards, supra* at 172. There appears to be general agreement that an adequate evaluation must touch on at least five areas:

1. Defendants should have a perception of the process not distorted by mental illness or disability. Whether phrased in terms of (a) an ability to perceive rationally and without distortion, (b) an "understanding" of the process, or (c) an "awareness" of the charge and possible verdicts, or (d) couched in a codified requirement that defendants understand that there is a judge on the bench, a prosecutor who will try to convict, and defense counsel who will defend against criminal charges, the thrust of the requirement is that defendants understand the nature of the process and their functions as participants within that process free from undue perceptual distortion.

2. Defendants require a capacity to maintain the attorney-client relationship, embracing an ability to discuss the facts of a case with counsel "without paranoid distrust," to advise and accept advice from counsel, to elect an appropriate plea, and to approve the legal strategy of the trial. The relationship requires an ability to consult rationally about a pending case which is something more than a superficial capacity to converse with others.

3. A third requirement, somewhat akin to the second, bears on the ability to recall and relate factual information. If a primary purpose of the prohibition against trying incompetent defendants is to preserve accuracy in factfinding, then defendants must be able to recall and relate factual occurrences. If they are not, they cannot reveal exonerating circumstances to their attorneys. This requirement has been variously phrased: that a defendant have "sufficient memory to relate answers to questions posed" to him or her, that "he [or she] can follow the testimony reasonably well," and that there be a "capacity to realistically challenge prosecution witnesses." Without that capacity, defen-

dants realistically are unable to exercise the rights to consult with counsel, testify in personal defense, and confront accusers.

4. Defendants should be capable of testifying in personal defense if that should be appropriate.

5. A final factor is a defendant's abilities to meet the competency criteria in the setting of the particular charges, the extent of the defendant's needed participation in trial proceedings, and the complexity of the case. Therefore, an evaluator should consider a defendant's mental ability in relation to the severity of the charge and the complexity of the case.

*ABA Criminal Justice Mental Health Standards, supra* at 173–75.

[¶ 28] We hold that the circumstances presented at trial were sufficient to trigger the requirement that the district court conduct a competency hearing in order to determine if deShazer was fit to proceed. *State v. Bostwick,* 1999 MT 237, ¶¶ 16–29, 296 Mont. 149, 988 P.2d 765, ¶¶ 16–29 (1999) (also see concurring opinion, *Bostwick,* ¶¶ 35–47); *see* 3 Charles Alan Wright, Federal Practice and Procedure: Criminal 2d § 556, n. 7 (1982); and *compare State v. Lopez,* 271 Kan. 119, 22 P.3d 1040, 1048–49 (2001) (district court affirmed based upon district court's thorough inquiry of the defendant and his counsel, as well as the report of an evaluation done by a jail physician during the noon recess); *State v. Boorigie,* 273 Kan. 18, 41 P.3d 764, 771–72 (2002) (district court affirmed although proceedings continued while competency evaluation was pending where evaluation ultimately determined that defendant was competent before trial began); *People v. Tally,* 7 P.3d 172, 178–79 (Colo.App. 1999) (where district court conducted one competency hearing, it was not error to fail to conduct second hearing merely because defendant stated he was not competent). Because no hearing was conducted, as was required by Wyo. Stat. Ann. § 7–11–303(a), we are without a sufficient record to ascertain whether or not deShazer was actually incompetent or if there was substantial evidence that deShazer was competent. As is demonstrated in the excerpts from the transcript of the proceedings set out above, rath-er than making a full inquiry of Dr. Kahn and deShazer when the opportunity was ripe, the district court curtailed that inquiry. As a consequence, we are compelled to reverse deShazer's convictions and remand for a new trial.

[¶ 29] In the *Bostwick* decision, the Montana Supreme Court opted to remand for a nunc pro tunc hearing on the question of competency. *Bostwick,* ¶ 31. We decline to do so in this case because we do not perceive that there is a meaningful possibility that such a hearing would fully protect deShazer's rights. In addition, because we also hold that defense counsel was ineffective, a new trial is necessary for that reason as well.

## Effective Assistance of Counsel

[¶ 30] Our standard of review with respect to this issue provides that the paramount determination is whether, in light of all the pertinent circumstances, trial counsel's acts or omissions were outside the range of professionally competent assistance. We indulge a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. An appellant claiming ineffective assistance of counsel must demonstrate on the record that counsel's performance was deficient and that prejudice resulted. We also inquire as to whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Schmidt v. State,* 2001 WY 73 ¶ 32, 29 P.3d 76, ¶ 32 (Wyo.2001); *Chapman v. State,* 2001 WY 25 ¶ 6, 18 P.3d 1164, ¶ 6 (Wyo.2001); *Pearson v. State,* 12 P.3d 686, 691–92 (Wyo.2000).

[¶ 31] In this instance, we find that it suffices to note that counsel appears to have admitted in court that he did not know how to handle this particular case, nor his client, and the record does not reflect what effort counsel made to become sufficiently learned in that regard so as to provide effective assistance to his client under these circumstances. Defense counsel's admitted lack of the basic knowledge essential to this area of criminal defense work, and an apparent trial strategy that did not evince a sound

legal foundation, mandate reversal of de-Shazer's conviction. These failings were instrumental in denying deShazer a meaningful defense, especially because the strategy chosen, that deShazer intended only to attempt to compel the victim to hear him out concerning their relationship, relied so heavily upon deShazer's ability to explain himself. The critical issue near the end of trial was an evident lack of competency on deShazer's part to testify in his own defense and to otherwise assist in that defense. *See generally*, George L. Blum, Annotation, *Adequacy of Defense Counsel's Representation of Criminal Client—Issues of Incompetency*, 70 A.L.R.5th 1, esp. § 8(b) (1999); George L. Blum, Annotation, *Adequacy of Defense Counsel's Representation of Criminal Client—Pretrial Conduct or Conduct at Unspecified Time Regarding Issues of Insanity*, 72 A.L.R. 5th 109, esp. § 5(b) (1999); and George L. Blum, Annotation, *Adequacy of Defense Counsel's Representation of Criminal Client—Conduct at Trial Regarding Issues of Insanity*, 95 A.L.R.5th 125, esp. § 3(b) (2002). We can only conclude that, under these peculiar circumstances, defense counsel was ineffective and that this ineffectiveness ultimately was prejudicial to deShazer's case. For this reason, too, we are compelled to reverse and remand for new trial.

## CONCLUSION

[¶ 32] Under the circumstances presented by this case, we hold that the district court erred in failing to conduct a competency hearing in the face of mounting doubt that the defendant was competent or fit to stand trial and, most especially, in the face of direct evidence from a psychiatrist that deShazer was unable to testify in his own behalf because of his mental problems. In addition, we hold that defense counsel was ineffective in representing deShazer to a degree that proved to be prejudicial to his defense. For these reasons, the judgment and sentence are reversed, and the matter is remanded to the district court for further proceedings consistent with this opinion.