# IN THE SUPREME COURT, STATE OF WYOMING

# 2021 WY 108

### OCTOBER TERM, A.D. 2021

October 12, 2021

JAMIE STUART SNYDER,

**Appellant**
**(Defendant),**

**v.**

S-20-0245

THE STATE OF WYOMING,

**Appellee**
**(Plaintiff).**

*Appeal from the District Court of Goshen County*
*The Honorable Patrick W. Korell, Judge*

*Representing Appellant:*

Office of the State Public Defender: Diane Lozano, State Public Defender; Kirk A. Morgan, Chief Appellate Counsel; Lauren McLane, Faculty Director, Matthew Klein, Student Director, Nathan Yanchek, Student Attorney, Thomas C. Fogle, Student Attorney, of the University of Wyoming Law Defender Aid Clinic. Argument by Mr. Klein.

*Representing Appellee:*

Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames, Senior Assistant Attorney General. Argument by Mr. Eames.

*Before FOX, C.J., and DAVIS\*, KAUTZ, and GRAY, JJ., and FROELICHER, D.J.*

*\* Chief Justice at time of oral argument.*

NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**FROELICHER, District Judge.**

[¶1]    Jamie S. Snyder appeals from his conviction for the first-degree murder of Wade Erschabek following a jury trial.  Mr. Snyder raises three issues on appeal.  First, Mr. Snyder challenges a circuit court decision that he was competent and fit to proceed. Second, he contends the district court erred in deciding that Mr. Snyder's statements to law enforcement were voluntary.  Finally, Mr. Snyder argues there was insufficient evidence of premeditation for the jury to convict him of first-degree murder.  We affirm.

## ISSUES

[¶2]    We restate the issues as:

> 1.    Did the circuit court err when it determined that Mr. Snyder was competent and fit to proceed?
>
> 2.    Did the district court err when it determined Mr. Snyder's statements to law enforcement were voluntarily made?
>
> 3.    Was there sufficient evidence of premeditation for a jury to convict Mr. Snyder of first-degree murder?

## FACTS

[¶3]    Mr. Snyder has a history of mental health issues, including commitments to mental health facilities.  In June and July of 2012, Mr. Snyder was hospitalized two times due to paranoid and psychotic symptoms, as well as homicidal ideation.  In 2014, he was again hospitalized and diagnosed with depression, a personality disorder, and substance abuse disorder.

[¶4]    On May 23, 2018, Mr. Snyder reported a burglary at his home.  Mr. Snyder believed the title to his truck and his social security card were stolen.  Mr. Snyder suspected Mr. Erschabek of having committed the burglary.  He told several acquaintances about his suspicions, and stated that Mr. Erschabek "needed to die."

[¶5]    Sometime during the afternoon of May 23, Mr. Snyder called his mother and was upset about the burglary.  Concerned about Mr. Snyder's behavior, his mother called in a welfare check.  The following morning, on May 24, 2018, Goshen County Sheriff's

1

Department Sergeant Kory Fleenor[1] went to Mr. Snyder's home to investigate the burglary. He also went to perform a welfare check on Mr. Snyder. Sergeant Fleenor observed that Mr. Snyder appeared pretty upset and concerned about the alleged burglary. During the welfare check he observed that Mr. Snyder was "very pleasant" and "was the clearest" he had seen Mr. Snyder. Sergeant Fleenor testified that he did not have any concern about Mr. Snyder harming himself or about his mental health.

[¶6]    Later in the afternoon, Mr. Erschabek and his friend Justin Ellis were driving through Fort Laramie to pick up a mattress and stopped at Gavin Martin's residence. On their way to Mr. Martin's home, Mr. Ellis saw Mr. Snyder pass them in his truck traveling in the opposite direction. Mr. Snyder, after passing Mr. Ellis and Mr. Erschabek, immediately turned his vehicle around and followed Mr. Ellis to Mr. Martin's home and parked within two feet of Mr. Ellis' vehicle.

[¶7]    After parking, Mr. Ellis stayed in his vehicle while Mr. Erschabek exited and walked to the passenger side of Mr. Snyder's truck. Mr. Erschabek began speaking to Mr. Snyder through the passenger side window. Mr. Ellis testified that the conversation seemed to be one-sided as Mr. Snyder did not appear to be talking. Mr. Ellis then exited his vehicle, and Mr. Snyder exited his truck holding a large black knife. Mr. Snyder moved between the vehicles, lunged at Mr. Erschabek and stabbed him in the chest with the knife. At that point, Mr. Ellis tried to call 911, but Mr. Snyder pointed his knife at Mr. Ellis and told him to "put the phone down." Mr. Ellis complied, and Mr. Snyder got into his truck and left. When emergency medical personnel arrived at the home, Mr. Erschabek was dead. The stab wound to Mr. Erschabek's chest was over five inches deep, cut three ribs, and penetrated his heart. Sergeant Fleenor located a black fixed-blade knife amongst some trees in the front yard of Mr. Martin's residence.

[¶8]    Mr. Snyder was arrested at his home later that day. When law enforcement arrived, Mr. Snyder had just taken a shower. After obtaining a search warrant, deputies searched Mr. Snyder's home and noticed that the towel in the bathroom was wet and there were fresh shavings in the sink.

[¶9]    In the early morning hours of May 25, 2018, at approximately 1:30 a.m., Deputy Edwin Ochoa drove Mr. Snyder to the area where he indicated that he dumped the clothing he was wearing at the time of the murder. Before Deputy Ochoa and Mr. Snyder arrived at the location, Deputy James Kuhns had already recovered the items. Deputy Kuhns found "some clothes, a vest, boots . . . [and] a knife holder – a sheath – that wraps around your leg" in a ditch off the roadway near the location that Mr. Snyder stated he dumped his

---

[1] Kory Fleenor was sworn in as the Goshen County Sheriff on January 7, 2019, but at the time of the murder was a sergeant with the Goshen County Sheriff's Department. Throughout this opinion, we will refer to Kory Fleenor as Sergeant Fleenor.

clothes. The deputy testified that he recognized the boots as belonging to Mr. Snyder based on previous encounters.

[¶10] Beginning at around 9:45 p.m. on May 24, 2018, Sergeant Fleenor and Investigator Rick Scott interviewed Mr. Snyder for approximately four hours at the jail. During the interview, Mr. Snyder provided several different stories about what had happened that day. Eventually, Mr. Snyder claimed he stabbed Mr. Erschabek in self-defense and that Mr. Erschabek lunged at him and impaled himself.

[¶11] The State charged Mr. Snyder with first-degree murder on May 25, 2018. On May 29, 2018, before the preliminary hearing, Mr. Snyder's counsel challenged Mr. Snyder's competency and filed a motion pursuant to Wyo. Stat. Ann. § 7-11-303, requesting that Mr. Snyder be examined to determine his fitness to proceed. The circuit court issued an order suspending the proceedings and ordered the Wyoming State Hospital (WSH) to examine Mr. Snyder's competency.

[¶12] In her first forensic report dated July 30, 2018, Dr. Katherine Mahaffey concluded Mr. Snyder was not competent and recommended that he be transferred to WSH for restoration of his competence. On September 14, 2018, the circuit court issued a written order suspending the proceedings and, in accordance with Wyo. Stat. Ann. § 7-11-303(e), committed Mr. Snyder to WSH, and directed WSH to determine whether there was a substantial probability Mr. Snyder would regain his fitness to proceed.

[¶13] On January 28, 2019, Dr. Mahaffey completed her restoration evaluation and concluded that Mr. Snyder was competent. Mr. Snyder's counsel requested a hearing pursuant to Wyo. Stat. Ann. § 7-11-303(g) to contest Dr. Mahaffey's conclusion. The circuit court held an evidentiary hearing on February 19, 2019. Dr. Mahaffey and Dr. Maximillian Wachtel, a forensic psychologist, testified.[2] Dr. Mahaffey testified consistently with her report that Mr. Snyder has the level of capacity related to fitness to proceed and there is no additional time necessary to achieve competency. Dr. Wachtel testified that he only met with Mr. Snyder one time and he did not have enough "experience yet with Mr. Snyder to come up with an opinion that would override . . . the evaluation done by [WSH] in terms of their diagnosis." He further testified that Dr. Mahaffey did a good job on her report and though he had concerns, he did not have enough information to contest her conclusions on Mr. Snyder's competency and fitness to proceed. The circuit

---

[2] The competency hearing was recorded by the circuit court's digital electronic recording system and then transcribed by a transcriptionist. The transcript included 32 separate instances where the testimony was transcribed as either "unintelligible" or "inaudible." Although neither party raised the quality of the recording as an issue, we take this opportunity to stress the importance of having high quality verbatim transcripts of important hearings.

3

court issued a written order concluding the State proved by a preponderance of the evidence that Mr. Snyder was fit to proceed.[3]

[¶14] On April 3, 2019, Mr. Snyder pled not guilty and not guilty by reason of mental illness (NGMI). The district court ordered Mr. Snyder undergo an NGMI evaluation pursuant to Wyo. Stat. Ann. § 7-11-304. Dr. Mahaffey, on behalf of WSH, evaluated Mr. Snyder. She concluded that at the time of Mr. Erschabek's death, Mr. Snyder "did not suffer from a mental illness or mental deficiency so severely abnormal as to have grossly and demonstrably impaired his perception or understanding of reality." In addition, she determined Mr. Snyder had the "capacity . . . to appreciate the wrongfulness of his conduct [and] to conform his conduct to the requirements of law." On September 4, 2019, Mr. Snyder requested a second evaluation to be completed by Dr. Wachtel pursuant to Wyo. Stat. Ann. § 7-11-304(g). The district court conditionally granted the second evaluation, but there is nothing in the record to suggest it was ever completed.

[¶15] On November 1, 2019, Mr. Snyder filed a motion to suppress the statements he made to law enforcement during the four-hour interview on May 24 and 25, 2018. Mr. Snyder's motion asserted his statements were not voluntary in violation of the United States and Wyoming Constitutions. Generally, Mr. Snyder argued his "serious mental illness" affected the voluntariness of his statements when combined with the "coercive nature of the custodial interrogation." On December 3, 2019, the district court held an evidentiary hearing. Following the hearing, the district court concluded Mr. Snyder's statements were voluntary and denied his motion to suppress.

[¶16] A jury convicted Mr. Snyder of first-degree murder following a four-day trial ending on February 13, 2020. On June 2, 2020, the district court sentenced Mr. Snyder to life imprisonment according to law. Mr. Snyder timely filed notice of appeal to this Court.

### DISCUSSION

**A.    Competency**

#### 1.    Standard of Review

[¶17] Currently, we review a trial court's decision on a defendant's competency by a two-part standard. First, we determine whether the trial court evaluated the defendant's competency by the correct standard. Second, we apply a substantial evidence standard to determine whether the decision is fairly supported by the record of the proceeding at which the determination is made. *Marshall v. State*, 2016 WY 119, ¶ 12, 385 P.3d 304, 308 (Wyo. 2016); *see also McLaren v. State*, 2017 WY 154, ¶ 14, 407 P.3d 1200, 1203-04 (Wyo.

---

[3] The circuit court held a preliminary hearing on the same day as the competency hearing and bound the case over to district court.

2017); *Schaeffer v. State*, 2012 WY 9, ¶ 32 n.2, 268 P.3d 1045, 1058 n.2 (Wyo. 2012); *Fletcher v. State*, 2010 WY 167, ¶ 12, 245 P.3d 327, 330-31 (Wyo. 2010)); *deShazer v. State*, 2003 WY 98, ¶¶ 12-13, 74 P.3d 1240, 1244-45 (Wyo. 2003).[4]

[¶18]   This standard of review originates from *deShazer,* where we said:

> We turn to the Tenth Circuit Court of Appeals for an outline of the standards that must be employed in the review of issues relating to competency of a defendant as it pertains to the trial process:
>
>> Although competence is a factual issue, that term, as this case clearly demonstrates, is not self-defining. Because competency to stand trial is an aspect of substantive due process, . . . the legal standard by which competency is to be evaluated is constitutionally mandated. Accordingly, the components of that standard, required as they are by the Constitution, do not vary according to the views of a particular court. The Constitution can require but one gauge against which to determine whether, because of his mental condition, a defendant's due process rights are violated by requiring him to stand trial. The content of the standard of competency is therefore a question of law which we review de novo.
>
> *Lafferty v. Cook*, 949 F.2d 1546, 1550-56 (10th Cir. 1991) (internal citations omitted); *State v. Soares*, 81 Hawai'i 332, 916 P.2d 1233, 1251 (App. 1996); *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam); and *see Hayes v. State*, 599 P.2d 558, 562-63 (Wyo. 1979).

*deShazer*, ¶ 12, 74 P.3d at 1244-45.  We continued:

> Once the trial court has "evaluated a defendant's competency by the correct standard, the second inquiry on review is whether the trial court's determination of a defendant's competency is fairly supported by the record of the proceeding at which the determination [is] made. . . . In other words, the

---

[4] We recently applied the substantial evidence standard of review to a challenge to a district court's decision denying a criminal defendant a third competency evaluation.  In that case, that parties agreed that we should review the trial court's decision under the substantial evidence standard.  *Merlak v. State*, 2021 WY 95, ¶ 15, 493 P.3d 187, 192 (Wyo. 2021)

substantial evidence standard of review governs the second inquiry." *Soares*, 916 P.2d at 1251.

*Id.* ¶ 13, 74 P.3d at 1245.

[¶19]   The State urges us to reconsider our standard of review and to adopt the abuse of discretion standard of review for defendant competency determinations.  According to it, the substantial evidence standard of review can be traced back to *Soares*, which we cited in *deShazer*.  In *Soares*, although recognizing that most appellate courts had adopted the abuse of discretion standard for reviewing a trial court's determination that a defendant was competent to standard trial, the Hawaii appellate court nevertheless adopted the substantial evidence standard utilized by the Tenth Circuit in *Lafferty v. Cook*, 949 F.2d 1546 (10th Cir. 1991).  *Soares*, 916 P.2d at 1251.  The State contends the *Soares* court's reliance on *Lafferty* was misplaced because it was a federal habeas case under 28 U.S.C. § 2254, and the question was whether the state trial court had applied the appropriate legal standard for competency.  *Lafferty*, 949 F.2d at 1548-50.  It did not address whether the trial court erred after applying the correct legal standard.  More importantly, the State informs us *Soares* has since been overruled by the Hawaii Supreme Court.  *See State v. Janto*, 986 P.2d 306 (Haw. 1999).  In *Janto*, the court instead adopted an abuse of discretion standard and explained:

> We overrule *Soares* and hold that the trial court's determination that a defendant is competent to stand trial will be reviewed under an abuse of discretion standard. *Accord Siah v. State*, 837 P.2d 485, 487 (Okla. Crim. App. 1992) (holding that "[d]etermination of competency to stand trial is a matter left to the sound discretion of the [trial] court"); *State v. Perkins*, 248 Kan. 760, 811 P.2d 1142 (1991) (holding that, "[o]n appeal, the reviewing court's inquiry on a trial court's determination that a defendant is competent is whether the trial court abused its discretion"). The standard for determining competence is statutorily mandated by HRS Chapter 704 and primarily a matter for the professional determination of the examiners appointed by the trial court in accordance with HRS Chapter 704. An abuse of discretion standard is appropriate because the determination relies upon the trial court's assessment of the testimony of expert witnesses and its observational assessment of the defendant.

*Janto*, 986 P.2d at 316.

[¶20]  We agree with the State.  The substantial evidence standard of review is not appropriate for reviewing defendant competency decisions.  In our jurisprudence, the

substantial evidence standard is primarily applied in administrative law.[5]  The phrase "substantial evidence" comes directly from the Wyoming Administrative Procedures Act[6] and is not included or referenced in Wyo. Stat. Ann. § 7-11-302.  The abuse of discretion standard is the appropriate standard of review to apply to a lower court's determination that a defendant is competent to stand trial.  As the *Janto* court aptly observed, such standard is fitting given the competency determination turns largely upon the lower court's assessment of expert testimony and its observations of the defendant.  *Janto*, 986 P.2d at 316.  Therefore, we overrule *deShazer* and its progeny with respect to the standard of review applicable to a lower court's determination that a defendant is competent to stand trial.  We will review a lower court's decision that a defendant is competent to stand trial for an abuse of discretion.  Its underlying factual findings, however, will be reviewed for clear error.

[¶21] This is the same standard we employ when reviewing a district court's determination that a child victim was competent to testify.  In *Young v. State*, there was confusion in our case law as to whether the clearly erroneous or abuse of discretion standard applied to determinations of child witness competency.  *Young v. State*, 2018 WY 53, ¶¶ 9-11, 418 P.3d 224, 226-27 (Wyo. 2018).  We noted the two standards had "much in common":

> The clearly erroneous and abuse of discretion standards of review have much in common, in that they are both deferential to the district court.  *See, e.g., Lovato v. State*, 2010 WY 38, ¶ 11, 228 P.3d 55, 57 (Wyo. 2010) (clearly erroneous); *Garland v. State*, 2017 WY 102, ¶ 24, 401 P.3d 480, 487 (Wyo. 2017) (abuse of discretion). Typically, though, the clearly erroneous standard is used to evaluate a district court's findings of fact, while another standard is used to determine whether the district court's decision was legally correct. For example, in reviewing a district court's ruling on a motion to suppress evidence allegedly obtained through an improper search and/or seizure, we apply the clearly erroneous standard to the district court's findings of fact and the de novo standard to its ruling on the underlying legal issue of whether the defendant's constitutional rights were violated. *See, e.g., Kennison v. State*, 2018 WY 46, ¶ 11, 417 P.3d 146, 147 (Wyo. 2018); *Jennings v. State*, 2016 WY 69, ¶ 8, 375 P.3d 788, 790 (Wyo. 2016).

---

[5] This Court applies the substantial evidence standard in cases where the administrative agency decision being reviewed was made after a contested case hearing.  *Wilson Advisory Comm. v. Bd. of County Comm'rs*, 2012 WY 163, ¶ 18, 292 P.3d 855, 861 (Wyo. 2012).

[6] Wyo. Stat. Ann. § 16-3-114(c)(ii)(E) (LexisNexis 2021) states that a court should "[h]old unlawful and set aside agency action, findings and conclusions found to be . . . [u]nsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute."

On the other hand, the abuse of discretion standard is generally used to review claims that the district court erred in admitting evidence when a proper objection was made at trial. *See, e.g., Garrison v. State*, 2018 WY 9, ¶ 19, 409 P.3d 1209, 1215 (Wyo. 2018). A review of cases from other jurisdictions reveals the abuse of discretion standard is commonly used to review a lower court's determination that a child witness was competent to testify. *See, e.g., Commonwealth v. Delbridge*, 578 Pa. 641, 855 A.2d 27, 34, n.8 (2003); *Baldit v. State*, 522 S.W.3d 753, 761 (Tex. Ct. App. 2017); *Davis v. State*, 24 Ark. App. 152, 751 S.W.2d 11, 13 (1988); *State v. Williams*, 2018 WL 1217361, *2 (Ohio Ct. App. Mar. 8, 2018); *State v. Spaniol*, 895 N.W.2d 329, 337 (S.D. 2017); *Marn v. People*, 175 Colo. 242, 486 P.2d 424, 426 (1971) (en banc); *Ortiz v. Commonwealth*, 276 Va. 705, 667 S.E.2d 751, 756 (2008).

*Young,* ¶¶ 12-13, 418 P.3d at 227. In the end, we concluded: "While the clearly erroneous standard of review is the correct standard for reviewing a district court's underlying factual findings, the abuse of discretion standard is appropriate for reviewing the district court's final determination of competence and, thus, the admissibility of the child's testimony." *Young*, ¶ 14, 418 P.3d at 227 (footnote omitted). *See also Miller v. State*, 2021 WY 16, ¶ 25, 479 P.3d 387, 393 (Wyo. 2021) ("We review the district court's competency determination for an abuse of discretion and its underlying factual findings under our clearly erroneous standard of review.") (citation omitted).

[¶22] A review of case law from other jurisdictions reveals that the abuse of discretion standard is commonly applied by appellate courts to review a lower court's decision that a defendant is competent to stand trial. *See, e.g., Julio Garcia v. State*, 300 So.3d 945, 965 (Miss. 2020) ("As to the trial court's actual finding—that Garcia was competent during the entire trial-court proceedings—we find no abuse of discretion.") (citation omitted); *Commonwealth v. Jones*, 90 N.E.3d 1238, 1248-49 (Mass. 2018) ("A judge's competency determination is reviewed for abuse of discretion.") (citation omitted); *State v. Marshall*, 362 P.3d 587, 592 (Kan. 2015) ("An appellate court applies an abuse of discretion standard when determining whether a district court made the correct decision regarding a defendant's competency to stand trial.") (citation omitted); *Harper v. State*, 579 N.E.2d 68, 70 (Ind. 1991) ("The trial court's decision as to whether a defendant is competent to stand trial will not be disturbed except for a showing of a clear abuse of discretion.") (citation omitted); *State v. Statczar*, 743 P.2d 606, 613 (Mont. 1987) ("Fitness to proceed to trial is a matter largely within the discretion of the District Court. Therefore, we will not overturn a decision of the District Court in the absence of a clear abuse of discretion.") (citations omitted); *State v. Ortiz*, 706 P.2d 1069, 1071 (Wash. 1985) ("The trial court has wide discretion in judging the mental competency of a defendant to stand trial. Accordingly, a

trial court's decision will not be reversed unless it has abused its discretion.") (citations omitted).

[¶23] Under the abuse of discretion standard, we consider whether the trial court could "reasonably conclude as it did." *Requejo v. State*, 2019 WY 44, ¶ 7, 439 P.3d 747, 749 (Wyo. 2019). *See also Miller*, ¶ 25, 479 P.3d at 393 ("Determining whether the trial court abused its discretion involves consideration of whether the court could reasonably conclude as it did, and whether it acted in an arbitrary and capricious manner.") (citation omitted). "An abuse of discretion can also exist if the wrong law has been applied, the correct law has been applied but incorrectly interpreted, or if the correct law has been improperly applied." *Steffey v. State*, 2019 WY 101, ¶ 18, 449 P.3d 1100, 1105 (Wyo. 2019) (quoting *Grove v. Pfister*, 2005 WY 51, ¶ 6, 110 P.3d 275, 278 (Wyo. 2005)).

[¶24] Under the clearly erroneous standard, we presume the lower court's underlying factual findings to be correct and view them in the light most favorable to the lower court "because it has an opportunity to view and hear the witnesses, and to assess credibility." *Cf. Maestas v. State*, 2018 WY 47, ¶ 7, 416 P.3d 777, 780 (Wyo. 2018) (citation omitted) (review of factual findings on a motion to suppress). *See also Miller*, ¶ 25, 479 P.3d at 393 (when reviewing a lower court's child witness competency determination, "we do not presume to place ourselves in the shoes of the trial court in these cases by reading a cold record. The trial court sees the witness's facial expressions, hears inflections in his voice and watches his mannerisms during examination. These observations are a vital part of the ultimate ruling on competency.") (citation omitted).

## 2. Law of Competency

[¶25] We have described the general legal principles underlying the requirement that a defendant be competent as follows:

> "A criminal defendant may not be tried unless he is competent, and he may not waive his right to counsel or plead guilty unless he does so 'competently and intelligently.'" *Godinez v. Moran,* 509 U.S. 389, 396, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993), quoting *Johnson v. Zerbst,* 304 U.S. 458, 468, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). The same standard of competency applies whether a defendant goes to trial or pleads guilty. *Godinez,* 509 U.S. at 398, 113 S.Ct. 2680. The United States Supreme Court has ruled that a defendant is competent, under the standards of due process, if he has "'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.'" *Godinez,* 509 U.S. at 396, 113 S.Ct. 2680, quoting *Dusky v. United States,*

362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam). The determination of whether a defendant is mentally fit to proceed must be made by the trial court. *Hayes v. State,* 599 P.2d 558, 563 (Wyo. 1979). "It is not in the nature of a defense to the charge. It is a threshold issue, necessary to be resolved to prevent a violation of due process through conviction of a person incompetent to stand trial." *Id.* Moreover, the competency requirement continues from the time of arraignment through sentencing. *See Godinez,* 509 U.S. at 403, 113 S.Ct. 2680 (Kennedy, J., concurring); *deShazer v. State,* 2003 WY 98, ¶ 20, 74 P.3d 1240, 1248 (Wyo. 2003).

*Follett v. State*, 2006 WY 47, ¶ 8, 132 P.3d 1155, 1158 (Wyo. 2006).

[¶26] In accordance with the due process requirement that a criminal defendant be competent, Wyoming adopted a statute which sets the standard by which a defendant's competency is measured. That statute provides:

(a) No person shall be tried, sentenced or punished for the commission of an offense while, as a result of mental illness or deficiency, he lacks the capacity, to:

(i) Comprehend his position;

(ii) Understand the nature and object of the proceedings against him;

(iii) Conduct his defense in a rational manner; and

(iv) Cooperate with his counsel to the end that any available defense may be interposed.

Wyo. Stat. Ann. § 7-11-302 (LexisNexis 2021).

[¶27] Under Wyo. Stat. Ann. § 7-11-302, a criminal defendant may be found unfit to proceed due to a "mental illness or deficiency." Section 7-11-301 defines "mental deficiency" as a "defect attributable to intellectual disability, brain damage and cognitive abilities." Wyo. Stat. Ann. § 7-11-301(a)(iii). Although the phrase "mental illness or deficiency" is defined in Wyo. Stat. Ann. § 7-11-304 for purposes of determining when a defendant is not responsible for criminal conduct as a result of mental illness, the term "mental illness" is not defined for purposes of the competency statutes. In other words, there is no specific definition of "mental illness" applicable to competency decisions under Wyo. Stat. Ann. § 7-11-302.

10

### 3.    Analysis

[¶28]  Mr. Snyder contests the circuit court's finding that he possessed the competency to "conduct his defense in a rational manner" and to "cooperate with his counsel to the end that any available defense may be interposed."  In support of his position, Mr. Snyder presents two distinct arguments.  First, he argues Dr. Mahaffey's conclusions are flawed because they were based on an incorrect premise that borderline personality disorder is not a mental illness.  Second, Mr. Snyder contends the evidence presented does not support the circuit court's conclusion that he was competent to proceed.

[¶29]  Whether or not Dr. Mahaffey was correct in implying that borderline personality disorder is not a mental illness or deficiency, that statement or implication was not the sole basis for her ultimate conclusions.  Mr. Snyder correctly stated that Dr. Mahaffey's conclusions indicated Mr. Snyder had no incapacities related to his competency in part because any incapacity was related to Mr. Snyder's "personality pathology" and not "due to mental illness or deficiency."  Dr. Mahaffey, however, testified she also based her conclusions regarding Mr. Snyder's fitness on the fact that his borderline personality disorder was stable.

[¶30]  In other words, assuming a borderline personality disorder qualifies as a "mental illness or deficiency" under Wyo. Stat. Ann. § 7-11-302, Dr. Mahaffey opined that Mr. Snyder's borderline personality disorder was stable and was not interfering with his ability to function. Dr. Mahaffey further testified Mr. Snyder was not chaotic, was able to comply, was able to work with his treatment providers and he did not "show that kind of chaos or anxiety that could contribute in interfering with his ability to work with [his] defense." Instead, Dr. Mahaffey attributed Mr. Snyder's behaviors to his lack of candor and unwillingness to cooperate.  Dr. Mahaffey concluded:

> In the previous report, this examiner expressed concern the Defendant's mental illness appeared to interfere with his ability to apply that knowledge in a rational manner. Based on a lengthy period of observation and assessment as well as additional collateral information, it appears that this initial assessment was inaccurate; and Mr. Snyder's presentation and behavior during the evaluation process was attributable to a lack of candor and willingness to cooperate, personality pathology, and not a psychotic process or major mental illness.

[¶31]  Therefore, even if Dr. Mahaffey may have incorrectly concluded that Mr. Snyder's borderline personality disorder was not a mental illness, her determination that he was competent did not rest entirely on that conclusion.  We therefore find Dr. Mahaffey's legal

11

conclusion that a personality disorder is not a mental illness did not require the circuit court to disregard her ultimate conclusions on Mr. Snyder's competency.[7]

[¶32] Applying our adopted standard of review, we further conclude the circuit court did not abuse its discretion in determining Mr. Snyder was competent to stand trial.[8]

[¶33] The evidence presented at the competency hearing was primarily the testimony of two expert witnesses. When weighing expert medical opinion testimony, the fact finder should consider: "(1) the opinion; (2) the reasons, if any, given for it; (3) the strength of it; and (4) the qualifications and credibility of the witness or witnesses expressing it." *Anastos v. Gen. Chem. Soda Ash*, 2005 WY 122, ¶ 20, 120 P.3d 658, 666 (Wyo. 2005) (quoting *Bando v. Clure Bros. Furniture*, 980 P.2d 323, 329-30 (Wyo. 1999)). A fact finder may "disregard an expert opinion if [it] finds the opinion unreasonable, not adequately supported by the facts upon which the opinion is based, or based upon an incomplete and inaccurate medical history provided by the claimant." *Taylor v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2005 WY 148, ¶ 15, 123 P.3d 143, 148 (Wyo. 2005). When a trial court is faced with conflicting expert opinions, it "does not clearly err simply by crediting one opinion over another where other record evidence exists to support the conclusion." *Jendresen v. State*, 2021 WY 82, ¶ 33, 491 P.3d 273, 284 (Wyo. 2021) (quoting *Fletcher*, ¶ 20, 245 P.3d at 333).

[¶34] Dr. Mahaffey, in her restoration report and her testimony, opined that Mr. Snyder was competent. Dr. Mahaffey's opinions were based upon numerous interviews with Mr. Snyder, her review of extensive collateral information pertaining to Mr. Snyder, his medical and psychological histories, and observation of him during his in-patient stay at WSH between September 24 and December 20, 2018. Dr. Mahaffey acknowledged Mr. Snyder has a borderline personality disorder which "could undermine a person's ability to work with their attorney," but she testified Mr. Snyder "didn't show that kind of chaos or anxiety that could contribute in interfering with his ability to work with [his] defense." She testified it was her opinion that Mr. Snyder was competent and did not need further treatment.

[¶35] Dr. Wachtel, a forensic psychologist retained by defense counsel performed only one clinical examination of Mr. Snyder for approximately five and one-half hours. Dr.

---

[7] We do not reach the question of whether a borderline personality disorder is a mental illness for purposes of competency under Wyo. Stat. Ann. § 7-11-302, because reaching that conclusion is unnecessary to our decision.

[8] It is worth noting that Mr. Snyder, following the circuit court's decision, did not raise his competency again while the case proceeded through the district court. Wyo. Stat. Ann. § 7-11-303 allows competency to be raised at any stage of the criminal proceedings when there is reasonable cause to believe the defendant is unfit to proceed. *See Merlak*, ¶ 15, 493 P.3d at 192 (reflecting that the court has a continuing duty to monitor a defendant for competency and that a second evaluation is potentially available upon a proper showing).

12

Wachtel did not opine that Mr. Snyder was not competent. Instead, he testified that he did not have enough "experience yet with Mr. Snyder to come up with an opinion that would override . . . the evaluation done by [WSH] in terms of their diagnosis." Dr. Watchel generally agreed Dr. Mahaffey's report was more accurate and merely indicated that Mr. Snyder's diagnosis could affect a person's decision-making ability, particularly regarding waivers, pleas, and trial.

[¶36] Dr. Wachtel's opinions as to the effect Mr. Snyder's personality disorder had on his competency were couched only in terms of possibilities. Dr. Mahaffey's opinions, on the other hand, were instead based upon a more extensive and thorough evaluation and more strongly stated. Although Mr. Snyder has a borderline personality disorder which could affect his capacity to conduct his defense in a rational manner and to cooperate with his counsel to the end that any available defense may be interposed, the evidence established his personality disorder was not affecting those abilities. Therefore, we conclude the circuit court did not abuse its discretion when it found Mr. Snyder competent to proceed.

**B.      Voluntariness**

> **1.      Standard of Review**

[¶37] The standard of review we apply to trial court decisions on the voluntariness of a defendant's statements to law enforcement has been described as:

> Voluntariness is a legal question; thus, we review the ultimate issue, whether a defendant's statements were voluntary, de novo. *Miller v. Fenton*, 474 U.S. 104, 110, 106 S.Ct. 445, 449-50, 88 L.Ed.2d 405 (1985); *Doyle* [*v. State*], 954 P.2d [969,] at 972 [(Wyo. 1998)]; *Simmers v. State*, 943 P.2d 1189, 1194 (Wyo. 1997); [*State v.*] *Evans*, 944 P.2d [1120,] at 1124 [(Wyo. 1997)]. On review, however, we will not disturb the trial court's findings of fact unless clearly erroneous. *Id.* We look to the totality of the circumstances to determine if the defendant's statements were voluntary. *Vigil v. State*, 859 P.2d 659, 664 (Wyo. 1993).

*Pena v. State*, 2004 WY 115, ¶ 7, 98 P.3d 857, 862 (Wyo. 2004) (quoting *Mitchell v. State*, 982 P.2d 717, 720-21 (Wyo. 1999)). Regarding our review of a trial court's factual findings on voluntariness, we have also said:

> This Court considers the evidence in the light most favorable to the trial court's determination because the trial court has the opportunity to hear the evidence and to assess the credibility of witnesses. *Id.* [*Hannon v. State*, 2004 WY 8, ¶ 12, 84 P.3d 320,

13

328 (Wyo. 2004)] When the defendant claims that his statements were involuntary, "it is the duty of an appellate court . . . 'to examine the entire record and make an independent determination of the ultimate issue of voluntariness.'" *Id*., ¶ 50, 84 P.3d at 339 (quoting *Beckwith v. United States*, 425 U.S. 341, 348, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1 (1976)).

*Sen v. State*, 2013 WY 47, ¶ 15, 301 P.3d 106, 114 (Wyo. 2013). If the court concludes a defendant's statements to police were involuntary, then it must determine *de novo* if the introduction of the statement was harmless. *See generally Large v. State*, 2008 WY 22, ¶ 25, 177 P.3d 807, 814-815 (Wyo. 2008); *Lewis v. State*, 2002 WY 92, ¶ 26, 48 P.3d 1063, 1071 (Wyo. 2002) ("the remaining question is whether the admission at trial of those statements that should have been suppressed was harmless error").

## 2.  Law of Voluntariness

[¶38] The "determination that a defendant was subject to custodial interrogation for purposes of *Miranda* does not answer the separate question of whether any statements given were given voluntarily." *Rodriguez v. State*, 2018 WY 134, ¶ 31, 430 P.3d 766, 773 (Wyo. 2018) (quoting *Jelle v. State*, 2005 WY 111, ¶ 15, 119 P.3d 403, 408 (Wyo. 2005)). "Confessions, admissions, and statements are constitutionally required to be voluntary by the Fifth and Fourteenth Amendment of the United States Constitution and by Art. 1, § 6 of the Wyoming Constitution." *State v. Evans*, 944 P.2d 1120, 1124 (Wyo. 1997) (quoting *Lego v. Twomey*, 404 U.S. 477, 478, 92 S.Ct. 619, 621, 30 L.Ed.2d 618 (1972)); *Black v. State*, 820 P.2d 969, 971 (Wyo. 1991)). Since its decision in *Bram v. United States*, 168 U.S. 532, 542, 18 S.Ct. 183, 187, 42 L.Ed. 568 (1897), the voluntariness requirement has been a part of the United States Supreme Court's constitutional jurisprudence. *Evans*, 944 P.2d at 1124-25.

[¶39] An "accused's extrajudicial statement" is deemed involuntary "until the State meets its burden of proving and persuading that the statement was made freely and voluntarily." *Evans*, 944 P.2d at 1127 (referencing *Maki v. State*, 18 Wyo. 481, 485-86, 112 P. 334, 335 (1911)). "The prosecution has the burden to prove, by a preponderance of the evidence, that a defendant's statement is voluntary." *Sen*, ¶ 19, 301 P.3d at 115-16 (quoting *Wilkins v. State*, 2005 WY 2, ¶ 9, 104 P.3d 85, 89 (Wyo. 2005)). The test for determining voluntariness is not limited to an objective test because we must look at the nature of the defendant. *Jelle*, ¶ 18 n.9, 119 P.3d at 410 n.9.

[¶40] "A confession is not voluntary if extracted by threats or improper influences or promises." *Rodriguez*, ¶ 31, 430 P.3d at 773 (citing *Garcia v. State*, 777 P.2d 603, 606 (Wyo. 1989)). "In Wyoming, coercive police tactics violate the due process clause of Wyo. Const. Art. 1, § 6 and statements elicited pursuant to these tactics may be suppressed."

14

*Rodriguez*, ¶ 33, 430 P.3d at 774 (citing *Evans*, 944 P.2d at 1125). "[I]nvoluntariness requires coercive state action, such as trickery, psychological pressure, or mistreatment." *Gunn v. State*, 2003 WY 24, ¶ 25, 64 P.3d 716, 723 (Wyo. 2003). We have said, however, that "[a] finding of coercion or overreaching by law enforcement does not necessarily require evidence of violence, threats, overt intimidation or misconduct" and that coercion can be mental as well as physical. *Hannon v. State*, 2004 WY 8, ¶ 54, 84 P.3d 320, 341 (Wyo. 2004) (citing *Garcia*, 777 P.2d at 606). "The use of misstatements or tricks in and of themselves does not render a confession or admission involuntary." *Gunn*, ¶ 25, 64 P.3d at 723 (citation omitted).

[¶41] Additionally, we explained:

> As one Wyoming jurist has noted:
>
> > The role of the courts is to ensure that an individual's right to remain silent offers true protection to the individual. It is therefore dangerous for courts to end their inquiry into whether an individual's statements are truly voluntary once they have located the magic phrase "you do not have to answer any questions and you are free to leave." Coercion does not always come in such easy to spot packages as racks and whips. All too often it comes in the more subtle forms of an individual placed in jeopardy and told to make a crucial decision without the benefit of an attorney.
>
> Thus, we have held particular tactics were not coercive when used by law enforcement on some suspects, but have found other tactics, used in combination with the particular personal characteristics of the accused, resulted in coercion. The inquiry is a fact-sensitive one, often resulting in cases that closely resemble each other being decided differently.

*Hannon*, ¶ 54, 84 P.3d at 341 (internal citations omitted)

[¶42] In *Evans*, we described some of the factors which should be considered when determining the voluntariness of a defendant's statements to law enforcement:

> In resolving the voluntariness issue, the trial court must consider the totality of the circumstances under which the statement was given, including:

> The atmosphere and events surrounding the elicitation of the statement, such as the use of violence, threats, promises, improper influence or official misconduct, the conduct of the defendant before and during the interrogation and the defendant's mental condition at the time the statement is made.

*Evans,* 944 P.2d at 1125 (citation omitted). We also described the factors to be considered in the analysis of "the characteristics of the accused and the details of the interrogation," including the following:

> whether the defendant was in custody or was free to leave and was aware of the situation; whether *Miranda* warnings were given prior to any interrogation and whether the defendant understood and waived *Miranda* rights; whether the defendant had the opportunity to confer with counsel or anyone else prior to the interrogation; whether the challenged statement was made during the course of an interrogation or instead was volunteered; whether any overt or implied threat or promise was directed to the defendant; the method and style employed by the interrogator in questioning the defendant and the length and place of the interrogation; and the defendant's mental and physical condition immediately prior to and during the interrogation, as well as educational background, employment status, and prior experience with law enforcement and the criminal justice system.

*Id*. at 1126 (citations omitted)).

### 3. Analysis

[¶43] Mr. Snyder argues the district court erred when it denied his motion to suppress and found his statements were voluntary. He contests the district court's conclusion that he had "sufficient intellect and experience to understand the situation he faced when being interrogated by law enforcement" and that his statements to law enforcement were voluntary.

[¶44] Mr. Snyder's arguments on the voluntariness of his statements focus on his deteriorating mental condition in the days leading up to Mr. Erschabek's death, Sergeant Fleenor's false statements about the existence of DNA evidence linking Mr. Snyder to the knife, and the timing and length of the interview. The State contends there was insufficient evidence to support that Mr. Snyder was deteriorating mentally, and Dr. Mahaffey's unrefuted testimony reflected Mr. Snyder was not suffering from a mental illness that

16

impacted his ability to participate voluntarily in the interview. The State also asserts Sergeant Fleenor's untruthful statement about DNA evidence is not sufficient to show Mr. Snyder's statements were involuntary and coerced, and that the length of the interview was used as an advantage by law enforcement.

[¶45] Certainly, there are several facts which could support a finding that Mr. Snyder's statements were involuntary. The interview lasted four hours, Mr. Snyder was in custody, and he was not wearing socks and shoes during a portion of the interview. Mr. Snyder has a significant history of mental illness, which includes delusional symptoms and diagnoses. Mr. Snyder's mother was concerned enough about Mr. Snyder's declining mental health to contact law enforcement for a welfare check. A witness observed Mr. Snyder walking alone down the railroad tracks and talking to his gloved hands the day before the killing. Mr. Snyder, during the first evaluations by Dr. Mahaffey in June and July 2018, told her that he thought the police outside his home on May 24, 2018, were tricolored people or aliens who were after him. Sergeant Fleenor stated to Mr. Snyder during the interrogation that Mr. Snyder's fingerprints and DNA were on the knife law enforcement found, though such statements were untruthful.

[¶46] Viewing the evidence in the light most favorable to the district court's determination, however, we agree the State proved by a preponderance of the evidence Mr. Snyder's statements to law enforcement were voluntary. According to Sergeant Fleenor, earlier on May 24, 2018, Mr. Snyder had been "very pleasant" and "was the clearest" he had seen him. Additionally, Sergeant Fleenor said he did not have any concern about Mr. Snyder harming himself or about his mental health at that time. Sergeant Fleenor read Mr. Snyder his *Miranda* rights, and Mr. Snyder waived those rights in writing and agreed to speak with law enforcement. The interview was conducted in the law library and not an interrogation room. Mr. Snyder was not physically restrained other than the fact he had been arrested and was in custody, but neither deputy had weapons with them. The interview was generally conversational, without any overt threats or overtly coercive law enforcement conduct. Mr. Snyder also had prior experience with law enforcement and no known educational deficiencies.

[¶47] Dr. Mahaffey, after watching the video recording of Mr. Snyder's interview, was not concerned that Mr. Snyder's mental health or personality disorder was affecting the voluntariness of his statements. She testified:

> [Mr. Snyder] appeared to track information just fine. He was fully aware that he was in custody. That he was interacting . . . with . . . Sergeant Fleenor [] who he had known from some time from previous encounters. He was aware he was in trouble. He was aware that [] at one point he made statements that he is aware he is providing enough evidence to I believe he said put him away for 25 years. So he was aware when he

17

was making incriminating statements or statements that were evidence that the police could use. So he seems to be fully connected to reality and aware of his surroundings and organized.

[¶48]   Although the interview lasted four hours, the length and timing of the interview is only one factor considered by the court in determining the voluntariness of a defendant's statements.  *Schwartz v. State*, 2021 WY 48, ¶ 15, 483 P.3d 861, 866 (Wyo. 2021). Moreover, there was no evidence presented establishing how law enforcement used the length of the interview or its timing to their advantage to coerce any of Mr. Snyder's statements.  *See Schwartz*, ¶ 17, 483 P.3d at 866-67.   As we have previously held "confinement to an interview room for 'the better part of a day,' when such detention serves the legitimate purposes of a murder investigation, cannot be characterized as coercive." *Sen*, ¶ 22, 301 P.3d at 116 (quoting *Bhutto v. State*, 2005 WY 78, ¶ 18, 114 P.3d 1252, 1262 (Wyo. 2005)).   Additionally, Sergeant Fleenor gave Mr. Snyder his *Miranda* advisements, Mr. Snyder acknowledged his rights, and he continued to speak with law enforcement.  *See Vena v. State*, 941 P.2d 33, 38 (Wyo. 1997) (finding Mr. Vena's statements were voluntary in part because he was advised of his *Miranda* rights two times before his admission), *abrogated on other grounds by Vaughn v. State*, 962 P.2d 149 (Wyo. 1998); *Simmers v. State*, 943 P.2d 1189, 1196 (Wyo. 1997) (finding Mr. Simmers statements were voluntary in part because he was advised of his *Miranda* rights and clearly understood those rights).   Finally, although Sergeant Fleenor was untruthful about the existence of DNA evidence, that single statement during a four-hour interview is insufficient, by itself, to show Mr. Snyder's statements were involuntary.

[¶49]   In addition, the circumstances surrounding Mr. Snyder's statements are dissimilar to the previous cases where a defendant's statements have been found to be involuntary. *See Black*, 820 P.2d at 972 (confession was involuntary where it resulted from a two-hour interrogation of a woman who was seven months pregnant and was upset and crying during the interrogation); *Evans*, 944 P.2d at 1127-29 (upheld trial court's decision that state did not prove defendant's statement was voluntary where the police officer's interview technique, tone, and approach were aggressive, insistently accusatory, and demanding); and *Frias v. State,* 722 P.2d 135, 142-43 (Wyo. 1986) (overturning a trial court ruling, noting there were threats, accusations and browbeating as well as a defendant who had only limited understanding of the English language and his rights under the American justice system).  Based on the record before us, the evidence did not establish the type of coercive state action necessary to render Mr. Snyder's statements involuntary.

## C.      Sufficiency of the Evidence on Premeditation

### 1.      Standard of Review

[¶50]   When reviewing Mr. Snyder's claim on the sufficiency of the evidence, the court determines "whether any rational trier of fact could have found that the essential elements of a charged crime were proven beyond a reasonable doubt on the evidence presented." *Morones v. State*, 2020 WY 85, ¶ 8, 466 P.3d 300, 303 (Wyo. 2020) (citing *Gonzalez-Chavarria v. State*, 2019 WY 100, ¶ 22, 449 P.3d 1094, 1099 (Wyo. 2019)).  "In doing so, we assume that the State's evidence is true, disregard any evidence favoring the defendant, and give the State the benefit of every favorable inference that may reasonably be drawn from the evidence." *Morones*, ¶ 8, 466 P.3d at 303 (citing *Gonzalez-Chavarria*, ¶ 22, 449 P.3d at 1099).  After examining the State's evidence, whether direct or circumstantial, we "do not substitute our judgment for that of jury," but instead, "we determine whether a jury could have reasonably concluded each of the elements of the crime was proven beyond a reasonable doubt." *Andersen v. State*, 2014 WY 88, ¶ 23, 330 P.3d 256, 264 (Wyo. 2014) (quoting *Guerrero v. State*, 2012 WY 77, ¶ 14, 277 P.3d 735, 738-39 (Wyo. 2012)).  Furthermore, we defer to the jury as the fact-finder, and "assume [the jury] believed only the evidence adverse to the defendant since they found the defendant guilty beyond a reasonable doubt." *Foltz v. State*, 2017 WY 155, ¶ 10, 407 P.3d 398, 401-02 (Wyo. 2017) (citations omitted).  Ultimately, our standard of review is not whether the evidence is sufficient for us, "but whether, when viewed favorably to the state, it was enough on which a jury could form a reasonable inference of guilt beyond a reasonable doubt." *Pena*, ¶ 37, 98 P.3d at 872; *Bouwkamp v. State*, 833 P.2d 486, 493 (Wyo. 1992) (citation omitted).

### 2.      Law on Premeditation

[¶51]   In *Bouwkamp*, we set out the following framework for evaluating whether there was sufficient evidence of premeditation:

> Evidence sufficient to sustain a finding of premeditation and deliberation "falls into three basic categories: (1) facts about . . . what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3) would . . . support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed'; (3) facts about

19

the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take the victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)."

*Bouwkamp,* 833 P.2d at 494-95 (citation omitted).

### 3.  Analysis

[¶52]  Mr. Snyder contends the evidence did not support the jury's finding that he engaged in planning activity.  Mr. Snyder generally asserts that his statements to law enforcement suggest there was no premeditation, Mr. Ellis' testimony did not demonstrate Mr. Snyder engaged in cool calculation before stabbing Mr. Erschabek, and the evidence about Mr. Snyder's mental health on the day of the killing weighs against the existence of planning activity.  In addition, Mr. Snyder argues the evidence regarding his motive to kill Mr. Erschabek was thin, and the evidence about the actual killing did not demonstrate he acted in an exacting and particular manner.

[¶53]  Mr. Snyder essentially asks us to reweigh the evidence, which we cannot do. Assuming the jury believed only the evidence adverse to Mr. Snyder, and viewing the evidence in favor of the State, there was sufficient evidence of premeditation for the jury to form a reasonable inference of guilt beyond a reasonable doubt.

[¶54]  There was evidence Mr. Snyder engaged in "planning activity."  Mr. Snyder investigated the alleged burglary of his home, and Mr. Erschebek was among the individuals he believed committed the burglary.  On the day before the killing, Mr. Snyder was carrying a knife in a holster on his chest and was very upset about the alleged burglary. Michael Paules said four days before the incident Mr. Snyder told him Mr. Erschabek "needed to die."  After seeing Mr. Erschabek in another vehicle, Mr. Snyder aggressively turned his big black truck around and closely followed Mr. Erschabek to the location of the stabbing.  Mr. Erschabek parked his truck within two feet of Mr. Ellis' vehicle and when Mr. Erschabek went to Mr. Snyder's passenger side window and began talking, Mr. Snyder was silent and "seemed serious."  As soon as Mr. Ellis exited his car, Mr. Snyder exited his truck with a "large, black knife" in his hand, then quickly went between the cars, "lunged" at Mr. Erschabek, and stabbed him in the chest.  The time that elapsed between when Mr. Snyder first saw Mr. Ellis and Mr. Erschabek driving through Fort Laramie, followed them to the Martin home, parked there, exited his truck with knife in hand, and then stabbed Mr. Erschabek allowed an inference of planning activity.

[¶55]  There was also evidence from which the jury could infer Mr. Snyder had a motive to kill Mr. Erschabek.  It is not disputed that Mr. Snyder, prior to the day of the stabbing,

20

was significantly concerned that his home had been burgled, which then caused him to be worried about his safety and the security of his home. In addition, the evidence established Mr. Snyder conducted his own investigation of possible suspects of the burglary, including Mr. Erschabek. Four days prior to killing Mr. Erschabek, Mr. Snyder indicated that he had a grudge against Mr. Erschabek and that Mr. Erschabek looked a little different and "needed to die."

[¶56] Finally, there was evidence supporting a finding that the manner of killing was so exacting and particular to be indicative of premeditation. Mr. Snyder carried his knife with him as he investigated the alleged burglary. Mr. Snyder had his knife in his hand when he exited his truck at Mr. Martin's home. When Mr. Snyder stabbed Mr. Erschabek, the knife went over five inches into Mr. Erschabek's chest, cut three ribs, and penetrated his heart. The jury had before it strong evidence that Mr. Snyder had a "preconceived design" to take Mr. Erschabek's life in a "particular way for a reason" and from which the jury could reasonably infer from his motive and planning activity.

## *CONCLUSION*

[¶57] The circuit court did not abuse its discretion in determining Mr. Snyder was competent and fit to proceed based upon the credibility and weight of Dr. Mahaffey's testimony. The state proved by a preponderance of the evidence that the circumstances of Mr. Snyder's statements to law enforcement were not improperly coercive and, therefore, his statements were made voluntarily. There was sufficient evidence for a reasonable jury to conclude beyond a reasonable doubt that Mr. Snyder premeditated before stabbing Mr. Erschabek. Therefore, we affirm his conviction.